IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| HARIOT E. HAYNES, | : | |
| | : | |
| Plaintiff, | : | CASE NO. |
| v. | : | 5:10-CV-321 (CAR) |
| | : | |
| TWIN CEDARS YOUTH AND FAMILY | : | |
| SERVICES, INC., F/K/A TWIN CEDARS | : | |
| YOUTH SERVICES, INC. D/B/A GEORGIA | : | |
| INDUSTRIAL CHILDREN'S HOME, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

## ORDER ON MOTION FOR SUMMARY JUDGMENT
## AND MOTIONS TO STRIKE

In this employment discrimination case, Plaintiff Hariot Haynes alleges that

while employed by Defendant Twin Cedars Youth and Family Services, Inc., she was

discriminated and retaliated against on the basis of her race in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981.  Currently

before the Court are several motions: Defendant's Motion for Summary Judgment [Doc.

18]; Plaintiff's Objection and Motion to Strike Inadmissible Evidence [Doc. 27];

Defendant's Objections and Motion to Strike Portions of Hariot Haynes's and Sabrina

Jackson's Affidavits [Doc. 34]; and Plaintiff's Objection and Motion to Strike Portions of

Thomas Slater's Declaration [Doc. 36], and the various responses and replies thereto.

1

Having considered each motion, each response, and the relevant case law, the Court finds that Plaintiff's Objection and Motion to Strike Inadmissible Evidence [Doc. 27] is **DENIED**; Defendant's Objections and Motions to Strike Portions of Hariot Haynes's and Sabrina Jackson's Affidavits [Doc. 34] is **DENIED**; and Plaintiff's Motion to Strike Portions of Thomas Slater's Declaration [Doc. 36] is **DENIED.** Defendant's Motion for Summary Judgment [Doc. 18] is **GRANTED**.

## Applicable Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party, or if reasonable minds could not differ as to the verdict. Id. at 249-52. When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, but the Court must not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex Corp., 477 U.S. at 323 (internal quotation marks omitted). "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party must then go beyond the pleadings and point to specific evidence raising a genuine issue of material fact, or otherwise show that the moving party is not entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 324-26. In the employment discrimination context, unverifiable conjecture, unsupported opinions, and unsubstantiated allegations of coworkers cannot suffice as viable summary judgment evidence, especially where contradictory of highly credible and authenticated record evidence. See Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 658-59 (11th Cir. 1998) (rejecting plaintiff's unverifiable, anecdotal testimony about alleged comparators).

**Background**

The relevant facts, viewed in the light most favorable to Plaintiff, are as follows. Defendant Twin Cedars is a private, for-profit company which provides specialized treatment for children and adolescents ages 7 through 17 who have been sexually abused or traumatized, who are severely emotionally disturbed, or who have exhibited sexually aggressive behaviors. Defendant operates several campuses in Georgia, including a campus in Macon, Georgia.

Defendant began operating the Macon campus on January 1, 2009. Prior to that date, the facility operated as the Georgia Industrial Children's Home ("GICH"), a residential care facility for children and adolescents who had been neglected, abused, or abandoned. The Georgia Industrial Children's Home Foundation ("Foundation") owns the GICH facility. In March 2008, after experiencing severe financial and managerial problems, the Foundation contacted Defendant's director, Michael Angstadt, and the two organizations entered into a consulting management contract in October 2008. The goal of the agreement was to get GICH financially stable. However, faced with insurmountable financial and operational problems, GICH was unable to continue operating independently, and Defendant began managing the facility in January 2009.[1]

---

[1] Although GICH no longer exists as a separate corporation, the facility still operates under the name Georgia Industrial Children's Home. However, for purposes of this motion, "Twin Cedars" or "Defendant" will be used to refer to the facility and its managing company.

### 1.   Changes to GICH structure and staff

In an effort to straighten out GICH's finances, Defendant made many changes to the structure, services, and staff of the facility.  GICH housed its residents in cottages, and during the transition the residents were consolidated from five to two cottages, Anderson Cottage and McCommon Cottage.  After consolidating, Twin Cedars laid off twelve staff members, four Caucasian employees and eight African American employees.  The facility began focusing its services on a more at-risk population, referred to as "maximum watchful oversight category."  [Doc. 21, ¶ 30].  This category is generally comprised of children who are just leaving or about to enter psychiatric institutions.

Two of Defendant's employees, Janet Lawson and Linda Finley, largely made the transitional and staffing decisions during this period.  Lawson was hired during the 2008 contract period, and became Assistant Director on January 1, 2009.  In this role, she is the primary supervisor over the cottages.  On January 1, 2009, Finley became Program Director over the entire Macon facility.  Finley and Lawson retained 16 GICH employees and moved them into positions and titles consistent with the other Twin Cedars campuses.  Specifically, Defendant moved GICH employees into the following positions: two Cottage Supervisors, one Assistant Cottage Supervisor, and 14 Group Leaders.  All of these employees are African-American.  Finley and Lawson held staff

meetings and notified employees that Defendant would require much tighter and stricter supervision of residents due to the change in services offered by the facility.

Despite the fact that Defendant assumed management of the campus, the racial makeup of the facility's staff remained largely the same. Most of the workers that staff the cottages are African American, while the management is nearly entirely Caucasian. Defendant is accredited by the Council of Accreditation, which encourages its organizations to have a staff that reflects the racial demographics of the facility's residents. Many of the residents at the Macon facility are African American.

### 2.  Plaintiff's Employment

Plaintiff was originally hired by GICH as a House Parent in May 1999. Plaintiff was subsequently promoted in 2002 to one of two Group Home Coordinator positions, which involved various administrative duties and transporting residents to and from school and medical appointments. The other Group Home Coordinator was Alethea Suarez, who is also African American. Generally, the Group Home Coordinators worked from 7 a.m. to 3 p.m. or from 8 a.m. to 4 p.m. In December 2008, Lawson and Finley decided to eliminate the Group Home Coordinator position, and moved Plaintiff and Suarez into Group Leader III positions. As a result, Plaintiff's pay decreased by $207.00 per biweekly pay period.

Twin Cedars divides Group Leaders into three types: II, III-D, and III.  Each type works with, cares for, and supervises residents.  The designations refer to education, experience, and pay.  Group Leader IIs have the least education and experience, while Group Leader III-Ds generally have some college or may have a degree, but do not have enough experience to qualify as a Group Leader III.  Finally, Group Leader IIIs generally have either significant experience or a college degree.

The change in Plaintiff's employment status was effective January 1, 2009, and Plaintiff began having to work evening, night, and some weekend shifts at McCommon Cottage.  Plaintiff primarily worked 3 p.m. – 11 p.m., although she generally worked the day shift on weekends.  The residents are in school during the day, and therefore the greatest need for supervision generally begins at 3 p.m., when they return to the cottages.  Defendant asserts that typically Cottage Supervisors, not Group Leaders, worked the day shift.  Nevertheless, Plaintiff has her own children and childcare responsibilities, and asked Lawson to move her back to the day shift on multiple occasions.  In doing so, Plaintiff pointed to fellow Group Leader Alethea Suarez, who was allowed to work day shifts at Anderson Cottage.  Ultimately, no action was taken on Plaintiff's request.[2]

_____

[2] Defendant asserts that no action was taken because Plaintiff did not ask anyone about scheduling besides Lawson.  Plaintiff asserts that she did not move her request forward because Lawson assured her that she would attempt to work the scheduling issue out.  For purposes of summary judgment, the Court accepts Plaintiff's version of events.

On January 9, 2009, Janice Jones, an African American Group Leader II, resigned from her position.  On February 10, 2009, Defendant hired Jessica Prosperie, who is Caucasian, as a Group Leader III-D.   During her orientation, Prosperie worked primarily day shifts.  After one week of orientation, Prosperie began working varied shifts, including both day and evening hours.  The parties dispute whether Prosperie worked in McCommon Cottage with Plaintiff, or whether she worked in Anderson Cottage, the other residential building in use at the time.  For purposes of summary judgment, the Court will accept Plaintiff's assertion that Prosperie worked primarily in Anderson Cottage.

Plaintiff asserts that Prosperie was given preferential treatment and allowed to work mostly day shifts, while Plaintiff was forced to typically work 3 p.m. – 11 p.m., and to frequently work on weekends.  In addition, Plaintiff asserts that Prosperie was not disciplined for failing to call in or report on a particular weekend, whereas other employees, including Plaintiff, were disciplined for such behavior.

### 3.  Plaintiff's Termination

In February and March 2009, Paula Pitts, who is African American and worked as the Assistant Cottage Supervisor in McCommon Cottage,[3] began noticing problems

---

[3] The primary Cottage Supervisor over McCommon Cottage was Sabrina Jackson, who is African American.  Ms. Jackson primarily worked day shifts during this period and is no longer employed by Defendant.

with Plaintiff's performance.  Pitts witnessed Plaintiff making negative comments about Twin Cedars in front of residents, such as "they out for color" and "it's a white thing." [Doc. 18-8, ¶ 3].  Pitts also witnessed Plaintiff bringing her children into a cottage; allowing her children to ride in a Twin Cedars van; using her cell phone excessively; and arriving late after picking up residents due to an unauthorized stop.

On at least one occasion, Plaintiff failed to show up for a weekend shift and did not call regarding her absence.  As noted above, Plaintiff asserts that Prosperie engaged in the same behavior and was not disciplined.  Defendant asserts that neither employee was disciplined for this conduct.  Viewing the facts in the light most favorable to Plaintiff, the Court will accept Plaintiff's assertion that Prosperie was not disciplined for this action.  Around the same time, Pitts also received a report from a resident that Plaintiff had left the resident alone in a Twin Cedars van while Plaintiff went inside her home.  Failing to maintain supervision of a resident is a terminable offense.

Plaintiff denies making negative comments, using her cellphone excessively, and failing to maintain supervision of a resident.  Plaintiff admits that prior to Defendant's involvement on the GICH campus, she allowed her children in the cottages.  However, Plaintiff maintains that since the policies changed, and Defendant began managing the campus, she had not allowed her children to be on Twin Cedars property.  For purposes of summary judgment, the Court accepts Plaintiff's version of events.

Nevertheless, based on Pitts's reports and particularly due to Plaintiff's alleged failure to maintain supervision of a resident, Defendant decided to terminate Plaintiff's employment.   Thomas Slater, who is Caucasian, is the Director of Human Resources and had the final authority to terminate employees.   He and Lawson met with Plaintiff and terminated her effective March 19, 2009.   Slater completed the paperwork associated with the termination, and noted that Plaintiff was terminated "for cause." Slater also authorized two weeks' severance pay and allowed Plaintiff to collect unemployment benefits.   Slater attributes the severance and benefits to Plaintiff's lengthy tenure with GICH.   Approximately 10 days after Plaintiff was terminated, Defendant hired Shamika Grayer, who is African American, as a Group Leader II.

Plaintiff filed a charge of discrimination with the EEOC, and after receiving her right to sue letter in June 2010, filed suit in this Court.  Plaintiff brings claims under Title VII, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981.  She alleges race discrimination in her demotion and termination, and alleges that she was retaliated against for engaging in protected activity.[4]   Defendant has now moved for summary judgment [Doc. 18].  Before addressing Defendant's Motion for Summary Judgment, the Court first turns to the multiple motions to strike that have been filed in this case.

---

[4] As discussed below, Plaintiff alleges that she engaged in protected activity when she complained about her work schedule.

10

## Discussion

### A. Motions to Strike

Both parties have expended a great deal of time and energy filing motions to strike, which many courts have described as "time wasters." Purdee v. Pilot Travel Ctrs., No. CV407-028, 2009 WL 423976, at *1 (S.D. Ga. Feb. 19, 2009); McNair v. Monsanto Co., 279 F. Supp. 2d 1290, 1298 (M.D. Ga. 2003); Carlson Corp./Southeast v. School Bd. of Seminole County, Fla., 778 F. Supp. 518, 519 (M.D. Fla. 1991).  In fact, "[u]nless it is clear that the matters stricken have no possible relationship to the controversy and may prejudice the other party, motions to strike are generally disfavored." McNair, 279 F. Supp. 2d at 1297.  Rather than striking a document or a portion thereof, it is usually more appropriate to "consider a party's objections to affidavits which are filed in support of a motion for summary judgment when ruling on the merits of a motion for summary judgment." Austin South I, Ltd. v. Barton-Malow Co., 799 F. Supp. 1135, 1145 (M.D. Fla. 1992).  Nevertheless, an affidavit submitted in connection with a motion for summary judgment is subject to a motion to strike if it does not meet the standards of Federal Rule of Civil Procedure 56(c)(4). McNair, 279 F. Supp. 2d at 1298-99.

1.  **Plaintiff's Objection and Motion to Strike Inadmissible Evidence [Doc. 27]**

Plaintiff seeks to have the Court strike portions of the declarations of Paula Pitts,

Thomas Slater, and Janet Lawson.  Plaintiff asserts that each paragraph contains hearsay

stemming from the following statement made by Paula Pitts:

> Shortly before Twin Cedars terminated [Plaintiff], I received a report from a resident that [Plaintiff] had stopped by her house while transporting a resident and had gone inside her house and left the resident in the van alone.   I reported this failure to supervise to Janet Lawson.   Soon thereafter, Twin Cedars terminated [Plaintiff's] employment.

[Doc. 18-8, ¶ 4].  Plaintiff asserts that this paragraph, together with paragraph 16 of

Slater's Declaration[5] and paragraph 13 of Lawson's Declaration,[6] should be stricken

because they contain hearsay and are not based on Pitts's personal knowledge as

required by Federal Rule of Civil Procedure 56(c)(4).

---

[5] Paragraph 16 of Slater's Declaration states:

> Twin Cedars ultimately terminated [Plaintiff] after she failed to maintain supervision of a resident.  I completed the paperwork related to [Plaintiff's] termination including but not limited to the document attached as Exhibit E, which is kept in Twin Cedars' personnel file for [Plaintiff] which is maintained in the regular course of Twin Cedars's [sic] business activity.

[Doc. 18-2, ¶ 16].

[6] Paragraph 13 of Lawson's Declaration states:

> The event that ultimately triggered [Plaintiff's] termination was Ms. Pitts' [sic] report to me that [Plaintiff] had picked up residents at school and taken them by her house in the Twin Cedars van.  [Plaintiff] had gone inside her house to do something and left the residents in the van unsupervised, which is completely unacceptable.

[Doc. 18-7, ¶ 13].

The Court concludes that Plaintiff has not shown good cause to strike these paragraphs.  As discussed below, Defendant has offered Pitts's testimony, and the related testimony of Slater and Lawson, to show its belief regarding Plaintiff's performance at the time she was terminated.  Whether Plaintiff actually left a resident unsupervised is, at this point, irrelevant.  A court is only concerned with whether the stated reason is pretext for discrimination, not whether the reason is true.  <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1188 (11th Cir. 2001); <u>Hawkins v. Ceco Corp.</u>, 883 F.2d 977, 980 (11th Cir. 1989) (employee's actual conduct irrelevant to the question of whether the employer believed the employee had done wrong).

In addition, Pitts's declaration complies with the Federal Rules of Civil Procedure.  Rule 56(c)(4) states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Pitts states that her declaration is based on her personal knowledge, and she testifies that she received a report from a resident regarding Plaintiff's behavior.  She does not assert that she was present when the alleged violation occurred.  Instead, she states she was part of the conversation in question, received the report directly from the resident, and in turn told her superiors.  "Under the Federal Rules of Evidence, personal knowledge can be established by showing that the witness

13

was in a physical position to see, hear, or otherwise perceive the matters to which the testimony relates." <u>Pashoian v. GTE Directories</u>, 208 F. Supp. 2d 1293, 1300 (M.D. Fla. 2002); Fed. R. Evid. 602.  Pitts was in the position to receive the report from the resident and thus has personal knowledge of it.   In addition, both Slater and Lawson have personal knowledge of Pitts's report, and personal knowledge of the resident's report or Plaintiff's behavior is not required.

In general, inadmissible hearsay cannot be considered on a motion for summary judgment.  <u>Macuba v. DeBoer</u>, 193 F.3d 1316, 1322 (11th Cir. 1999).  This rule applies to affidavits and testimony given on deposition.  <u>Id.</u>  However, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." <u>Id.</u> at 1323 (citation omitted).  Thus, if the statement falls within an exception to the hearsay rule or is not offered for the truth of the matter asserted, it may be considered on summary judgment.

The statement made by Pitts and the related statements by Slater and Lawson are not hearsay and are admissible.  Plaintiff's Motion to Strike Inadmissible Evidence [Doc. 27] is **DENIED.**

14

**2.   Defendant's Objections and Motion to Strike Portions of [Plaintiff's] and Sabrina Jackson's Affidavits [Doc. 34]**

Defendant asserts that portions of [Plaintiff's] and Sabrina Jackson's affidavits should be struck because they contain (1) statements not based on personal knowledge; (2) hearsay; and (3) inadmissible conclusory statements.

**(a) Testimony regarding Defendant's reasons for terminating Plaintiff**

The majority of the testimony Defendant seeks to strike from Plaintiff's Affidavit disputes the testimony that formed the basis of Plaintiff's initial Motion to Strike:

> Paula Pitts [sic] statement that she received a report from a resident that I stopped by my home while transporting a resident and had gone inside my home and left a resident in the van alone is false.   The above statements that are repeated in Janet Lawson's Declaration are false.   The above statements that are repeated in Thomas Slater's Declaration are false.

[Doc. 24-1, ¶¶ 27-29].   As previously stated, Rule 56(c)(4) requires that an affidavit be made on personal knowledge, as opposed to information and belief.   Fed. R. Civ. P. 56(c)(4).   Clearly, Plaintiff may testify as to her actions and whether she failed to maintain supervision of a resident, and Defendant did not challenge Plaintiff's assertions that she did not violate company policies.   However, it is difficult to see how Plaintiff would have personal knowledge of the resident's report to Pitts when Plaintiff admits that she does not know which resident made the report.   Equally puzzling is

how Plaintiff could have personal knowledge of Pitts's subsequent reports to Lawson and Slater.

Defendant also asserts that several paragraphs of Sabrina Jackson's Affidavit contain information not based on Jackson's personal knowledge. Specifically, Defendant challenges paragraphs 3 and 9 – 16 of Jackson's Affidavit. In these paragraphs, Jackson disputes the policy violations allegedly committed by Plaintiff, testifying that none of the violations occurred, and that any reports regarding them were false. As Defendant points out, Plaintiff admits that although Jackson was Plaintiff's supervisor, Jackson typically worked the first shift, while Plaintiff generally worked evening and weekend shifts. In her Affidavit, Jackson does not state that she was working the days that Pitts and Lawson received the various reports regarding Plaintiff's behavior, and thus it is unclear how Jackson would have personal knowledge of these matters when she did not work the same shift.

Nevertheless, a court may strike *or* disregard the improper portions of an affidavit submitted in connection with a motion for summary judgment, and consider the remainder of the testimony or statement. Lee v. Nat'l Life Assurance Co. of Canada, 632 F.2d 524, 529 (5th Cir. 1980).[7] The portions of the affidavits Defendant seeks to strike did not materially affect or even play into this Court's decision on summary

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

judgment, and thus Defendant's Motion is essentially moot.  However, to the extent any portion of Plaintiff's testimony was relevant, the Court chooses to exercise its discretion and disregard any improper testimony or statements rather than striking the material.

**(b) Testimony regarding Jessica Prosperie**

Defendant also asserts that several paragraphs of Plaintiff's Affidavit dealing with Prosperie and her tenure with Defendant should be stricken.  In these paragraphs, Plaintiff testifies about Prosperie's schedule and job duties.  Defendant asserts that Plaintiff does not have personal knowledge of Prosperie's schedule and performance at Twin Cedars because Plaintiff did not hire or supervise Prosperie, and Plaintiff provides no other support for her assertions.

The Court rejects Defendant's argument that an individual may not testify about a coworker's duties or performance unless that individual supervised or hired the coworker.  Personal knowledge may be inferred from the contents of an affidavit. Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  Further, "common sense dictates that if an affiant is an employee of a company, she has personal knowledge of events and circumstances that occurred at the company within her sphere of observation."  Davis v. Valley Hospitality Serv., LLC, 372 F. Supp. 2d 641, 653 (M.D. Ga. 2005), overruled on other grounds, 211 Fed. Appx. 841 (11th Cir. 2006).  Plaintiff worked with Prosperie before her termination and had the opportunity to observe her

schedule and duties.  Defendant has not shown good cause to strike these portions of Plaintiff's affidavit.  Defendant's Objections and Motion to Strike Portions of Plaintiff's and Sabrina Jackson's Affidavits [Doc. 34] is **DENIED.**

### 3. Plaintiff's Objection and Motion to Strike Portions of Thomas Slater's Declaration [Doc. 36]

Finally, Plaintiff seeks to have this Court strike paragraphs 3-6 and 8-10 of Thomas Slater's second Declaration.  Plaintiff asserts two bases for this request: (1) portions of this testimony relate to Plaintiff's time records that Plaintiff asserts were not produced during discovery, and (2) Slater's testimony regarding the standards of the Council on Accreditation, the organization that accredits Twin Cedars, is self-serving and contradicts his prior testimony.  As an initial matter, Defendant has produced evidence that the time records *were* provided during discovery, and Plaintiff does not dispute this.  Thus, the Court refuses to strike Slater's testimony about Plaintiff's time records.

With regard to Slater's allegedly contradictory testimony, the Court notes that the more appropriate route would have been to point out any contradictions in the course of Plaintiff's response to Defendant's Motion for Summary Judgment, as opposed to expending the energy necessary to file a third motion to strike. Nevertheless, the Eleventh Circuit has explained that a court may only disregard an affidavit "that contradicts, without explanation, previously given clear testimony."

18

Lane v. Celotex Corp., 782 F.2d 1526, 1532 (11th Cir. 1986).  "[A] district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition."  Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986) (citation omitted).

Strangely, as Defendant notes, the deposition testimony Plaintiff seeks to strike does not even refer to the Council on Accreditation.  Instead, the testimony refers to Defendant's reasons for terminating Plaintiff's employment.  Thus, the Court can find no contradiction whatsoever, much less an "inherent[ ] inconsistency" necessary for the Court to disregard the declaration.  Tippens, 805 F.2d at 951.

Plaintiff also points to deposition testimony of Linda Finley in support of her assertion that portions of Slater's declaration "should be stricken as a sham."  A basic tenet of the "sham affidavit doctrine" is that a court may disregard an affidavit when it contradicts *that party's* earlier deposition testimony.  Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1316 (11th Cir. 2007).  Therefore, Plaintiff's Motion to Strike Portions of Thomas Slater's Declaration [Doc. 36] is **DENIED.**

### B.  Motion for Summary Judgment

Plaintiff brings her discrimination and retaliation claims pursuant to Title VII and 42 U.S.C. § 1981.  Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race." 42 U.S.C. § 2000e-2(a).   Under 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts … as is enjoyed by white citizens." Claims of race discrimination and retaliation are cognizable under Title VII and § 1981, and the analysis under both statutes is the same.  Standard v. A.B.E.L. Serv., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Thus, the Court will address Plaintiff's Title VII claims with the understanding that the analysis applies to her § 1981 claims as well.

### 1.  Disparate Treatment Claims – Demotion and Termination

Plaintiff seeks to avoid summary judgment based on what she alleges to be direct evidence of discrimination, but no such evidence exists.   "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  In its Answer, Defendant admitted Plaintiff was demoted and required to work night shifts while a Caucasian employee was allowed to work during the day. [Doc. 3 ¶ 14].  Plaintiff asserts that this admission constitutes direct evidence.  However, at the most, this statement suggests that discrimination could be inferred by the trier of fact; whereas with direct evidence, "the fact that the evidence exists, by itself, *proves* the discrimination." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 n.6 (11th Cir. 1987) (emphasis in original).  Defendant's statement is an acknowledgement of the facts; it is

not proof that Plaintiff was demoted because of her race. Thus, because there is no direct evidence in this case, Plaintiff must prove discrimination based on circumstantial evidence.

Claims of race and gender discrimination based on circumstantial evidence are evaluated under the familiar <u>McDonnell Douglas</u> burden-shifting framework. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). To prove a disparate treatment claim under Title VII or § 1981, Plaintiff must first establish a prima facie case. To do so, she must show: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by, or treated less favorably than, someone similarly situated outside her protected class. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 n.6 (1981). The employer then has the opportunity to articulate a legitimate, nondiscriminatory reason for its action. Finally, the burden shifts back to Plaintiff to produce sufficient evidence to allow a fact finder to conclude that the employer's reasons were merely pretext for discrimination. <u>Wascura v. City of South Miami</u>, 257 F.3d 1238, 1242-43 (11th Cir. 2001).

**(a) Prima facie case**

The Court finds that Plaintiff has established a prima facie case of discrimination. As a threshold matter, Plaintiff has met the first three prongs of the prima facie case

with regard to her termination and demotion.  She is a member of a protected class, and for purposes of this Motion, Defendant concedes that she was qualified for her position. The Court also finds Plaintiff suffered an adverse employment action.[8]

Finally, Plaintiff must show that she was either (1) replaced by someone outside her protected class, or (2) treated less favorably than someone similarly situated outside of her protected class.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 n. 6 (1981).  With respect to this last element, "the individuals must be similarly situated in all relevant respects besides race, since different treatment of dissimilarly situated persons does not violate civil rights law." Jackson v. Bellsouth Telecomm., 373 F.3d 1250, 1273-74 (11th Cir. 2004) (internal citations and quotations omitted).  In this case, Plaintiff makes both arguments.   Although the Court finds Plaintiff's arguments regarding replacement unpersuasive, Plaintiff has established a prima facie case by showing that a similarly situated employee was treated more favorably.

---

[8] With regard to Plaintiff's demotion claim, Defendant attempts to argue Plaintiff's move to the Group Leader position was not a demotion because the Group Home Coordinator position was eliminated.  The Court finds this argument hard to accept in light of the fact that Defendant has admitted, on several occasions, that Plaintiff was demoted.  Admissions in an answer are considered judicial admissions and are binding on the party who makes them.  Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1983).  Defendant admitted it demoted Plaintiff in its Answer ("Defendant admits that on January 1, 2009, it demoted Plaintiff to the position of Group Leader, which resulted in a decrease in her bi-weekly pay" [Doc. 3, ¶ 9]); in response to Plaintiff's Complaint ("when [Plaintiff] was demoted, she was made to work evenings from 3 – 11 p.m." [Doc. 3, ¶ 14]); and in its position statement to the EEOC ("It is true that [Plaintiff] was demoted from the position of Group Home Coordinator" [Doc. 22, p. 45]).  Accordingly, the Court finds that Defendant has admitted that Plaintiff was demoted and suffered an adverse employment action.

Plaintiff asserts that she was replaced by a Caucasian employee, Jessica Prosperie, who was hired over one month before Plaintiff's termination.  Defendant, on the other hand, contends Plaintiff was replaced by an African American employee, Shamika Grayer, who was hired 10 days after Plaintiff's termination.  In response, Plaintiff creatively argues that Grayer was hired as a "cover up" for Defendant's discriminatory hiring practices.   To determine whether a non-minority replaces a particular employee, "where [that] employee's position is clearly delineated and responsibilities are well defined, the court should focus on the person that physically replaced the employee or consider whether that job title was actually filled." Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005) (citing Hawkins, 883 F.2d at 977).

Plaintiff asserts that she was replaced by Prosperie because after her termination, Prosperie began working Plaintiff's shift and assumed her job responsibilities.  The duties of all Group Leaders are the same, and the titles of Group Leader II, III-D, and III only relate to experience and pay.   Thus, it is unclear how Plaintiff can show that Prosperie assumed Plaintiff's duties.  See Bogle, 162 F.3d at 658-59 (rejecting plaintiff's unverifiable, anecdotal testimony about alleged comparators).  In addition, Prosperie was hired on February 10, 2009, over one month before Plaintiff was terminated, and shortly after another worker, Janice Jones, resigned from her position as Group Leader.  Further, Plaintiff's arguments that Prosperie took over Plaintiff's shift and duties are not

supported by the record.   The timesheets submitted by Defendant indicate that Prosperie primarily worked the same shift as Plaintiff, 3 p.m. – 11 p.m., prior to Plaintiff's termination.

Finally, ten days after Plaintiff was terminated, Defendant hired Shamika Grayer, who is African American, as a Group Leader II.   Although Plaintiff claims that Defendant's decision to hire Grayer was a "cover up" for discrimination, Plaintiff has provided no evidence in support of this.   Due to the timing of hiring, the Court must assume that Grayer actually replaced Plaintiff.   Thus, Plaintiff has failed to show that she was replaced by someone outside her protected class.

However, the Court finds that Defendant has conceded that Prosperie, a similarly situated Caucasian employee, was treated more favorably with regard to shifts.   As noted above, Defendant admitted in its Answer that "when Plaintiff was demoted, she was made to work evenings from 3 – 11 p.m. and weekends while a white person named Jessica Prosperie was allowed to work the day shift." [Doc. 3, ¶ 14]. Generally, the rule is that "a party is bound by the admissions in his pleadings." Cooper v. Meridian Yachts, Ltd., 575 F. 3d 1151, 1177 (11th Cir. 2009) (citations omitted).   And where a party admits a fact in its answer, it is estopped to deny that fact later. Columbus Bank & Trust Co. v. McKenzie Trucking & Leasing, LLC, No. 4:07-CV-189 (CDL), 2009 WL 3526648, at *3 (M.D. Ga. Oct. 23, 2009); Mills v. Innovative Energy

24

<u>Global, Ltd.</u>, No. 3:09CV294-MCR/CJK, 2011 WL 1299938 (N.D. Fla. Mar. 31, 2011) (same).

Defendant has not addressed this admission, and in its Motion and Reply, neglects to explain or even mention this concession.  Thus, despite the fact that the record indicates that Plaintiff worked one more day shift than Prosperie during their joint tenure at Twin Cedars, the Court finds that Defendant has admitted Plaintiff was treated less favorably than a fellow employee outside her protected class.  <u>See</u> <u>Best Canvas Prod. & Supplies, Inc.</u>, 713 F.2d at 621 ("Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.") (citations omitted).  In light of this admission, the Court finds that Plaintiff has established a prima facie case of race discrimination based on her termination and demotion.

**(b) Defendant's legitimate, nondiscriminatory reasons.**

As noted above, once a prima facie case has been established, Defendant may rebut it by articulating a legitimate, nondiscriminatory reason for the adverse employment action.  <u>Cleveland v. Home Shopping Network, Inc.</u>, 369 F.3d 1189, 1193 (11th Cir. 2004).  Defendant has only the burden of production, and does "not need to persuade the court that it was motivated by the reason."  <u>Id.</u>  Defendant has enumerated several policy violations as factors in Plaintiff's termination, including

Plaintiff bringing her children into a cottage; allowing her children to ride in a Twin Cedars van; using her cell phone excessively; arriving late from picking up residents as a result of making an unauthorized stop; and making negative comments to residents. However, the proverbial straw that broke the camel's back was the resident's report that Plaintiff left a child unsupervised in a Twin Cedars van.  Defendant has met the burden of production, and Plaintiff must prove that Defendant's reasons were mere pretext for unlawful discrimination.

**(c) Pretext**

When an employer offers more than one nondiscriminatory reason, the plaintiff must then "proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." <u>Wascura</u>, 257 F.3d at 1243.  Although Plaintiff makes many arguments regarding pretext, most of them are wildly speculative and unsupported by any evidence.

Plaintiff first asserts that Defendant's legitimate, nondiscriminatory reasons given for her termination are not valid because she was not disciplined or "written up" prior to her termination, and because there was no performance evaluation in her personnel file.  Plaintiff asserts that if her performance was substandard, then those issues would have been documented and subsequently produced.

26

Indeed, the absence of disciplinary documentation may indicate pretext.  Id. at 1245 (noting that lack of complaints or disciplinary reports in personnel file could support finding of pretext, but only where employer had formal review process for employees).  However, Plaintiff has not established that Twin Cedars had a policy for completing write-ups for individuals in her position, and she has not pointed to any other similarly situated individuals who had write-ups in their personnel files.  Further, Defendant's employee handbook provides:

> Violation of any of [the foregoing] rules may lead to disciplinary action, up to and including immediate discharge.  Obviously, this list is not all inclusive and there may be other circumstances for which employees may be disciplined, up to and including immediate discharge.

[Doc. 18-2, p. 26].  Defendant acknowledges that it completes performance reviews, but indicates that these reviews are completed once a year, and Plaintiff was terminated before the annual review period.  Thus, Plaintiff has failed to lay the proper foundation to support an inference of discrimination based on an absence of reviews or write ups.  She has not shown that Twin Cedars had a policy and practice of thoroughly documenting disciplinary actions, and therefore the lack of discipline or evaluations does not demonstrate pretext.

Plaintiff also argues that Defendant has given inconsistent reasons for her termination.  She asserts that at various points, Defendant has asserted that Plaintiff was fired because of financial reasons and because of her "attitude problems," in

27

addition to the reasons Defendant now articulates as its legitimate, nondiscriminatory reasons for Plaintiff's termination.   Identifying inconsistencies in an employer's testimony may be evidence of pretext, but the "existence of a possible additional non-discriminatory basis for … termination does not [  ] prove pretext." Tidwell v. Carter Prod., 135 F.3d 1422, 1428 (11th Cir. 1998).   In this case, Plaintiff has not shown that Defendant's additional potential reasons for termination—finances and attitude—are inconsistent with any other reasons presented.[9]

Plaintiff points out that Defendant offered her severance pay and did not oppose her application for unemployment benefits.   By Plaintiff's reasoning, if she was not terminated because of her race, but actually terminated because she failed to maintain supervision of a resident, Defendant would have opposed her application for benefits. The Court finds this argument unpersuasive.   Georgia bars an employee from receiving unemployment benefits if the employer shows, by a preponderance of the evidence, that the employee was fired for failing to obey orders, rules, or instructions.   O.C.G.A. § 34-8-194; MCG Health, Inc. v. Whitfield, 302 Ga. App. 408, 690 S.E.2d 659 (2010).   The employer must show that the discharge was as a result of the employee's deliberate,

---

[9] The Court notes that the testimony Plaintiff cites for this argument does not support her statements. Slater, whose deposition she points to, actually states that Plaintiff was not fired for "attitude problems," but indicates that her attitude was a factor in her termination. [Doc. 22, p. 35].  Likewise, Plaintiff points to Director Michael Angstadt's testimony for the proposition that she was fired because of finances. However, the testimony she cites to actually discusses the layoffs in 2008, prior to Plaintiff's termination. [Doc. 18-3, p. 8].

conscious fault.  Skinner v. Thurmond, 294 Ga. App. 466, 669 S.E.2d 457 (2008) (defining "fault" as more than a mere failure to perform one's work duties).  Given that the employer's burden is by a preponderance of the evidence, Defendant's failure to challenge Plaintiff's application for unemployment benefits does not, by itself, support an inference of pretext.  Slater testified that Plaintiff was awarded severance and benefits because she had been working at the GICH facility for ten years, not because of any reasons related to her termination.

Plaintiff also makes several arguments connected to the racial demographics of the GICH facility.  As noted above, Defendant is accredited by the Council of Accreditation, which encourages its organizations to have staff demographics that reflect the demographics of the residents.  At the GICH facility, all administrative employees are Caucasian, and all other workers, including all individuals who directly supervise the residents, are African-American.  In fact, 90% of Defendant's staff is African American.  [Doc. 18-9, p. 25].  Plaintiff asserts that as a result of the Council's guidelines and the racial makeup of the GICH staff, Defendant was motivated to use racial quotas during the hiring process.

By Plaintiff's logic, Defendant had too many African American employees and consequently fired employees based on their race in an effort to obtain Caucasian employees to fulfill the ideal quota.  Based on these demographics, Plaintiff theorizes,

"a black employee in the position of Paula Pitts would get the idea that white employees were considered more valuable than black employees because they were in such short supply and were needed to satisfy the accrediting body." [Doc. 24, p. 16]. Plaintiff denies that she committed any policy violations, and asserts that Pitts' desire to "curry favor with her employer" caused her to lie and generate false reports regarding Plaintiff's performance. Id. at 15. Although Plaintiff has come up with creative arguments, she has pointed to absolutely no facts to support them. "[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (citations omitted). Thus, without any evidence supporting her arguments, Plaintiff has failed to show that Defendant's reasons for her termination were pretext for discrimination.

Plaintiff also disputes that she engaged in any policy violations. She denies that her performance was deficient and denies that she left a resident unsupervised at any point. However, there is no indication that Defendant had any reason to disbelieve the resident's report regarding Plaintiff's behavior. This Court's inquiry is limited to whether Pitts and the other members of management believed that Plaintiff left the child unsupervised, and whether that reason was behind her termination. Elrod v.

<u>Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991); <u>Hawkins</u>, 883 F.2d at 980 (employee's actual conduct irrelevant to the question of whether the employer believed the employee had done wrong).   This Court does not "sit as a super-personnel department that reexamines an entity's business decisions." <u>Denney</u>, 247 F.3d at 1188 (citation omitted).   Thus, Plaintiff's claim that she did not actually leave the child unsupervised is irrelevant.   Plaintiff has provided no evidence that Lawson, Pitts, and Slater had any reason not to believe the reports of Plaintiff's performance, and therefore Plaintiff has failed to establish that the reasons behind her termination were, in reality, pretext for unlawful discrimination based on race.

### 2.  Retaliation[10]

Plaintiff alleges that she was retaliated against on the basis of two actions: (1) complaining about her work schedule, and (2) "because of her supervisor [sic] alleged honest assessment of inadequate work performance." [Doc. 24, p. 9].  She alleges that her complaints about working the evening shift, which Slater labeled as an "attitude problem," were the reason for her termination.   Although Plaintiff's second instance of alleged protected activity is practically unintelligible, the Court presumes she is referring to Pitts's reports regarding her work performance.

---

[10] Plaintiff is also asserting a claim of retaliation under § 1981 as well as Title VII.  As noted above, the analysis for claims under these statutes are the same, and the Court will analyze Plaintiff's Title VII claim with the knowledge that the analysis applies to her § 1981 claim as well.

Defendant asserts that Plaintiff cannot establish a prima facie claim because she cannot show that she has engaged in any statutorily protected activity.  The Court agrees.  Plaintiff, on her part, asserts that her prima facie case of discrimination based on her termination doubles for her prima facie retaliation claim.  Despite Plaintiff's efforts at efficiency, the same elements do not work for both claims.

Title VII's anti-retaliation provision prohibits employers from discriminating against an employee: (1) "because [s]he has opposed any practice made an unlawful employment practice" (the "opposition clause"), or (2) "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the "participation clause").  42 U.S.C. § 2000e-3(a).  To establish a claim of retaliation under Title VII, a plaintiff must show that she "engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008).  After the plaintiff establishes the basic elements of a claim, the pattern follows the burden-shifting framework of McDonnell Douglas.  Goldsmith, 513 F.3d at 1277.

Plaintiff has not alleged that she took part in any investigation or proceeding at Twin Cedars, so her instances of alleged protected activity would fall under the "opposition clause."  A plaintiff engages in protected activity under this clause when

she opposes an employer's conduct based on "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). This standard involves a subjective and objective component, so the plaintiff must show not only that she subjectively believed the employer's practices were unlawful, but also that her belief was objectively reasonable in light of the circumstances. Id.

An even more basic requirement of opposition conduct is that a plaintiff must somehow connect her complaint of unfair treatment to her protected characteristic. "[T]o engage in protected activity, the employee must still at the very least, communicate her belief that discrimination has occurred to the employer, and cannot rely on the employer to infer that discrimination has occurred." Demers v. Adams Homes of Northwest Fla., Inc., 321 Fed. Appx. 847, 852 (11th Cir. 2009) (internal citations omitted); see also, 2 EEOC Compliance Manual § 8-II-B(1) (2000) (indicating that the anti-retaliation protection "applies if an individual explicitly or implicitly communicates to his or her employer … that its activity constitutes a form of employment discrimination").

Although Plaintiff complained to Lawson about her schedule on multiple occasions, she freely admits that she did not tell anyone that she believed the changes in her employment were related to her race. [Doc. 18-5, p. 79]. For that matter, she freely

33

admits that she did not complain to any Twin Cedars staff that any aspect or problem with her employment was related to her race. [Doc. 18-5, p. 57-58]. This admission that she never complained of unfair treatment based on her race defeats any claim of retaliation. Thus, Plaintiff cannot show she engaged in any protected activity and cannot establish a prima facie case of retaliation, and Defendant's request to dismiss this claim is **GRANTED.**

**Conclusion**

For the foregoing reasons, Plaintiff's Objection and Motion to Strike Inadmissible Evidence [Doc. 27] is **DENIED**; Defendant's Objections and Motions to Strike Portions of Hariot Haynes's and Sabrina Jackson's Affidavits [Doc. 34] is **DENIED**; and Plaintiff's Motion to Strike Portions of Thomas Slater's Declaration [Doc. 36] is **DENIED.** Defendant's Motion for Summary Judgment [Doc. 18] is **GRANTED**.

SO ORDERED, this 15th day of March, 2012.


S/  C. Ashley Royal
C. ASHLEY ROYAL, CHIEF JUDGE
UNITED STATES DISTRICT COURT


AES/lmh/ssh